**EASTERN BAND OF CHEROKEE INDIANS, Appellee,**

v.

**NORTH CAROLINA WILDLIFE RE-SOURCES COMMISSION, Clyde P. Patton, Executive Director, Appellant,**

and

**State of North Carolina Department of Natural and Economic Resources, George Little, Secretary, Defendants, International Association of Fish and Wildlife Agencies, Amicus, United States of America, Amicus.**

**No. 76–2161.**

United States Court of Appeals, Fourth Circuit.

Argued April 6, 1978.

Decided Nov. 30, 1978.

John A. Powell, Asheville, N. C. (Bruce A. Elmore, Asheville, N. C., Millard Rich, Raleigh, N. C., on brief), for appellant.

Daniel H. Israel, Boulder, Colo. (Arlinda Locklear, Native American Rights Fund, Washington, D. C., Ben Bridgers, Holt, Haire & Bridgers, Sylva, N. C., Sally N. Willett, Native American Rights Fund, Boulder, Colo., on brief), for appellee.

Edward J. Shawaker, Atty., Dept. of Justice, Washington, D. C. (Peter R. Taft, Asst. Atty. Gen. and Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., on brief), for United States as amicus curiae.

Paul A. Lenzini, Chapman, Gadsby, Hannah & Duff, Washington, D. C., on brief, for amicus curiae International Association of Fish and Wildlife Agencies.

Before HAYNSWORTH, Chief Judge, and LAY * and RUSSELL, Circuit Judges.

HAYNSWORTH, Chief Judge:

In the district court, the Eastern Band of Cherokee Indians obtained a declaratory judgment that North Carolina may not enforce its fishing licensing laws with respect to non-Indians fishing for trout in streams on the Band's reservation. North Carolina has appealed, and we affirm.

The history of the status of the Eastern Band of Cherokee Indians and of their reservation, the Qualla Boundary, sufficiently appears in earlier opinions.[1]

Before 1965 the Band established a Fish and Game Management Enterprise, the primary purpose of which was to regulate sport fishing by persons not members of the Band. The Band and many of its members are financially dependent upon income derived from tourism. Camping and sport fishing draw many visitors to the reservation each summer. The Band charges each non-member a fee for fishing in its streams, and these fees are revenues for the Band's treasury. Moreover, visitors who come to fish spend money with other members of the Band who run shops, restaurants and other commercial enterprises.

In January 1965 the Band and the United States Department of the Interior entered into an agreement under which the United States has stocked streams on the reservation with trout large enough to attract fishermen. In recent years, fish released weekly during the tourist season have aggregated more than 200,000 each year.

The 1965 agreement provided that a non-member adult would be required to have a North Carolina fishing license, but that provision was expressly deleted in a new agreement of June 7, 1976. In that year, North Carolina had increased its fishing license fee and eliminated one-day permits. The result was that a prospective fisherman was required to buy a state fishing license for $5.50. The Band set its own fee at only $2.00, and the testimony showed that the combined fee of $7.50 for fishing permits for one day was a substantial deterrent to prospective fishermen. Obviously if the state fishing license fee was inapplicable, the Band could very substantially increase its revenues from its own fishing permits by charging substantially more than $2.00 per person.

North Carolina's continued insistence upon enforcement of its fishing licensing laws led to the commencement of this action, and a declaratory judgment in favor of the Band.

Questions of conflicting tribal-state jurisdiction are no longer resolved by automatic application of the tribal sovereignty doctrine enunciated by Mr. Chief Justice Marshall in *Worcester v. Georgia*, 6 Pet. 515, 8 L.Ed. 483 (1832), and most controversies are settled by reliance on federal preemption principles. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 173, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *see Bryan v. Itasca County*, 426 U.S. 373, 376 n.2, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Abrogation of the *Worcester* rule of complete sovereignty means states may regulate reservation Indians and non-Indians in certain situations. Absent acts of Congress or strong federal policies indicating a desire to exclude state regulation, inquiry should be directed to the right of reservation Indians to make their own laws and to govern themselves. State action which substantially impinges upon that right is impermissible. *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). Under *Wil-*

---

* Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. *See Crowe v. Eastern Band of Cherokee Indians, Inc.*, 506 F.2d 1231 (4th Cir. 1974); *Haile v. Saunooke*, 246 F.2d 293 (4th Cir. 1957); *United States v. 7,405.3 Acres of Land*, 97 F.2d 417 (4th Cir. 1938); *United States v. Colvard*, 89 F.2d 312 (4th Cir. 1937); *United States v. Wright*, 53 F.2d 300 (4th Cir. 1931); *United States v. Boyd*, 83 F.2d 547 (4th Cir. 1897); *United States v. Parton*, 46 F.Supp. 843 (W.D. N.C.1942), *rev'd per curiam*, 132 F.2d 886 (4th Cir. 1943).

*liams,* state regulatory laws may apply to tribal regulations unless their application would frustrate tribal self-government or impair a right granted or reserved by federal law. *See Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 482–83, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *Mescalero Apache Tribe v. Jones, supra; McClanahan v. Arizona State Tax Comm'n, supra; Kennerly v. District Court,* 400 U.S. 423, 426–27, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971); *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 686–87 and n.3, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *Organized Village of Kake v. Egan,* 369 U.S. 60, 67–68, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

■ We find enforcement of North Carolina's license requirement against non-Indian fishermen on the tribe's reservation violates both parts of the *Williams* preemption test. For over a decade the United States has subsidized the tribe's sport fishing program by stocking its waters with trout raised by the Department of the Interior.[2] The government supplies the fish and necessary personnel for the ostensible purpose of assisting the tribe's commercial fishing program which is aimed at attracting non-Indian fishermen to visit the reservation. This governmental assistance bolsters the Band's economic well being, and is consistent with the United States' trust obligations toward Indian tribes. *See Morton v. Mancani,* 417 U.S. 535, 541, 552–55, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). The Band has long been the beneficiary of governmental aid, and this program is only one aspect of the government's help. *See United States v. Wright, supra,* at 304–312.

The Band has gained much from this assistance. It will gain much more if prospective fishermen not already licensed by North Carolina are not required to purchase North Carolina licenses. In contrast, North Carolina has no perceivable interest in reservation fishing. The fish are hatched and raised to maturity by the federal government and placed in the streams of the res-

ervation by federal agents. They are placed in the streams in a cooperative endeavor to provide the Band with a commercial fishing resource. There is no endeavor to conserve the fish or to protect the waters as natural spawning streams. The trout are simply placed into the streams for the purpose of luring sport fishermen to the economic advantage of the Band and its members. We conclude that the strong federal policy supporting the Band's fishing program and the significant federal efforts sustaining it demonstrate an intention to preclude state regulation of non-member fishing on the Band's reservation.

If we were required to reach the second part of the *Williams* test, we would readily find that the state's regulation frustrates and impedes one major goal of tribal self-government, financial self-sufficiency. This case is quite different from *Moe v. Salish & Kootenai Tribes, supra,* where the Court was careful to stress the imposition of a state sales tax borne by non-Indians on the reservation did not frustrate tribal self-government. Imposition of North Carolina's license requirement would impair the Band's attempts to manage its own affairs by curbing its revenues and reducing the receipts of many of its members doing business with tourists.

This is not a case such as *United States v. Sanford,* 547 F.2d 1085 (9th Cir. 1976). In *Sanford,* Montana's laws controlling the hunting of elk were held applicable to nonmembers of the tribe on Indian reservation. Montana may have a substantial interest in protecting game such as elk which do not recognize reservation boundaries and may be expected regularly to move back and forth across them. And, because they are mobile, Montana may have a substantial interest in conserving their elk population, even when individual members of that population are on an Indian reservation. More importantly, however, there was no showing in *Sanford* that the applicability of Montana's game laws respecting elk would

---

2. The Department's participation in the program is authorized by 16 U.S.C. § 661 and 25 U.S.C. § 13.

materially affect or frustrate the Indians' governance of themselves or any commercial, conservationist or other program administered by the Indians for their own advantage. Here, in contrast, we can conceive of no possible interest of north Carolina in this purely commercial undertaking, while the stocking of the streams and the licensing of visiting fishermen by the Band is an established program of the Band's from which the Band itself and its members derive substantial economic benefits, benefits which are greatly diminished by North Carolina's enforcement of its own fishing licensing laws.

In most situations, a state possesses a significant interest in the conservation and protection of the fish and game which reside within its boundaries, and may extensively regulate activities injurious to these resources. *E. g., Baldwin v. Fish & Commission of Montana*, 436 U.S. 371, 98 S.Ct. 1852, 1861, 56 L.Ed.2d 354 (1978); *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 284, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977). This is true of activities on Indian reservations unless, as in this case, there is a basis for a finding of federal preemption.[3]

For these reasons, we affirm the district court's grant of declaratory relief.

*AFFIRMED.*

---

**3.** Each case of state regulation of on-reservation hunting and fishing is unique, and the extent to which the state may regulate such activity necessarily depends upon such factors as the tribal constitution and its powers to regulate such activity; the character of the animals involved, whether migratory or stationary; the nature of the waters involved, whether streams or major tributaries; and the varying state interests in the regulation of on-reservation activity by non-Indians. Granted these variables, the courts have reached differing results in cases concerning the reach of state regulatory laws onto reservations. *Compare United States v. State of Montana*, 457 F.Supp. 599 (D.Mont.1978) (allowing on-reservation regulation of hunting and fishing); *White Mountain Apache Tribe v. State of Arizona*, No. 77–867 (D.Ariz. Jul. 31, 1978) (same); *State of California v. Quechan Tribe*, 424 F.Supp. 969 (S.D.Cal.1977) (same) *with Confederated Tribes of Colville Indian Reservation v. State of Washington*, 412 F.Supp. 651 (E.D.Wash.1976) (denying state power to regulate on-reservation fishing); *Mescalero Apache Tribe v. State of New Mexico*, No. 77–395 (D.N.M. Aug. 2, 1978) (denying state power to regulate on-reservation hunting and fishing); *see also Quechan Tribe v. Rowe*, 531 F.2d 408 (9th Cir. 1976) (recognizing tribal power to restrict access to reservation and arrest powers).