**MESCALERO APACHE TRIBE,**
Plaintiff–Appellee,

v.

**STATE OF NEW MEXICO and William S. Huey, Individually and as Director of New Mexico Department of Game and Fish, or his Successors in Office, Defendants–Appellants.**

No. 78–1790.

United States Court of Appeals,
Tenth Circuit.

Argued Oct. 17, 1979.

Decided Aug. 13, 1980.

Jeff Bingaman, Atty. Gen. and Thomas L. Dunigan, Deputy Atty. Gen., Santa Fe, N. M. (Thomas Patrick Whelan, Jr., Asst. Atty. Gen., Santa Fe, N. M., with them on briefs), for defendants–appellants.

George E. Fettinger, Alamogordo, N. M. (Kim Jerome Gottschalk, Santa Fe, N. M., with him on brief), Fettinger & Bloom, Alamogordo, N. M., for plaintiff–appellee.

Steven E. Carroll, Atty., Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Robert L. Klarquist and Edward J. Shawaker, Attys., Dept. of Justice, Washington, D. C., on brief), for the United States as amicus curiae.

Paul A. Lenzini and Susan A. Glotz, Attys., Chapman, Duff & Paul, Washington, D. C., filed an amicus curiae brief for the Intern. Ass'n of Fish and Wildlife Agencies.

Daniel H. Israel, Native American Rights Fund, Boulder, Colo., Robert J. Nordhaus and Adelia W. Kearny, Nordhaus, Moses & Dunn, Albuquerque, N. M., filed an amicus curiae brief for the Jicarilla Apache Tribe.

Robert B. Hansen, Utah Atty. Gen., Richard L. Dewsnup and Dallin W. Jensen, Asst. Attys. Gen., Salt Lake City, Utah, filed an amicus curiae brief for the State of Utah.

Before DOYLE, BREITENSTEIN and McKAY, Circuit Judges.

McKAY, Circuit Judge.

This case involves a challenge to the State of New Mexico's attempt to regulate the management and harvesting of wildlife resources within the boundaries of the Mescalero Apache reservation. The Tribe carried its challenge to the district court

where it secured a judgment declaring that the State may not ·apply its hunting and fishing laws to any person, Indian or non–Indian, within the boundaries of the tribal reservation. The court also enjoined the State from enforcing its game laws "against any person either on the Reservation or after they [sic] have left the Reservation for acts done on the Reservation." Record, vol. 1, at 221. The State concedes its lack of jurisdiction over tribal members on the reservation, but appeals the district court's resolution as to non–members of the Tribe.[1]

In 1977 the Tribe, as part of "an extensive tourism program designed to bring income and employment to the Reservation,"[2] Record, vol. 1, at 205, adopted various hunting and fishing ordinances to improve management of reservation wildlife resources. These ordinances were adopted pursuant to the tribal constitution and were duly approved by the Secretary of the Interior. Some of the ordinances are clearly inconsistent with state laws.[3] For example, the Tribe specifically does not require that a hunter on its reservation purchase a state license and, in contrast to state law, the Tribe permits elk and antelope hunters to purchase permits in consecutive years. In addition, tribal hunting seasons do not all correspond with those of the State, and bag limits differ. By obeying the more restrictive of the regulations, a non–member hunter on the reservation could conform his behavior to the dictates of both Tribe and State. His doing so, however, would render much of the tribal regulatory scheme a nullity.

The revenue derived directly and indirectly[4] from visiting sportsmen comprises a significant portion of the tribal budget, but reservation hunting and fishing by non–members is but a minuscule part of the overall state total.[5] Although the State argues that wildlife management *efficiency* requires its jurisdiction over reservation activities, no claim is made that any species is endangered. *Cf. Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165, 176–77, 97 S.Ct. 2616, 2623–24, 53 L.Ed.2d 667 (1977). In fact, the State agrees that tribal management of reservation wildlife resources has been exemplary, and in conformance with accepted wildlife management procedures. Record, vol. 1, at 134. The Tribe maintains a large, well–trained enforcement staff and receives support from the Bureau of Indian Affairs.

In the factual situation presented by this case, the State is unable to claim that either it or its lands played any significant role in the creation and preservation of the reservation wildlife resources. Instead, much of the reservation wildlife is effectively a creation of the Tribe and the federal government. For example, the antelope population on the reservation is nonmigratory, and few animals ever cross the boundaries. In recent years, the herd's protection has been

---

1. For most purposes, the important distinction is between tribal members and non–members, not between Indians and non–Indians. Members of other tribes generally visit the Mescalero reservation on the same footing as non–Indians. *See Washington v. Confederated Tribes of Colville Indian Reservation*, —— U.S. ——,. - --, 100 S.Ct. 2069, 2081–2083, 65 L.Ed.2d 10 (1980).

2. The parties stipulated that "[t]he purpose of the tourism program is to provide income for the Mescalero Apache Tribe which may be used for its governmental purposes and economic development." Record, vol. 1, at 121–22.

3. The Tribe may be seeking to create jurisdictional disputes. However, no negative inference should be attached to such a posture. In fact, a clear intent to preempt state jurisdiction is an element in the Tribe's favor. *See Confederated Tribes of Colville Indian Reservation v. Washington*, 591 F.2d 89, 91 (9th Cir. 1979).

4. The Tribe has erected a resort complex where many sportsmen stay while on the reservation. Because of the recreation facilities at the resort, many nonhunters accompany the sportsmen. In recent years direct tribal income from hunting and fishing activities has exceeded $250,000 per year. The indirect revenues increase that total. Record, vol. 1, at 135.

5. For example, in a recent year the Tribe sold 50 elk licenses, while the State sold 14,000. Ten tribal antelope licenses were available, compared to 3500 for the State. Tribal deer licenses permitted the taking of 500 deer; the State issued 100,000 licenses.

entirely in tribal hands. Furthermore, the Tribe has taken affirmative steps to build an elk herd. Prior to 1966, only 13 elk grazed in the general area of the reservation. In 1966–67, the National Park Service donated 162 elk. Through considerable range development, the Tribe removed cattle from direct competition with the elk for grazing land. The elk herd has grown to 1200, many of which wander off the reservation during part of the year. The migratory elk thus provide significant hunting opportunities for non–members outside the reservation, and the Tribe, despite its fundamental role in herd development, makes no attempt to limit that hunting.

The reservation has no natural lakes. Several man–made lakes have been constructed with federal funds and are stocked from a national fish hatchery on the reservation. Federal officials from the hatchery also provide the Tribe with technical assistance. The State has never stocked reservation lakes and no longer stocks any reservation streams. The entire tribal fishing program now exists independent of the State.

## I. Justiciability

Before proceeding to the merits, we must dispose of several preliminary matters raised by the State. The State challenges, as it unsuccessfully did below, the Tribe's right to bring this suit. The State asserts that the Tribe has no standing and that the suit is otherwise not justiciable.

■ On the standing issue, the State argues that "[t]he Tribe is seeking to enjoin the enforcement of State penal statutes which do not apply to it and which do not threaten it or its members in any real, direct and immediate sense." Brief for Appellant at 20. In the State's view, a challenge to the state regulations may be prosecuted only by an aggrieved non–member sportsman. Since the Tribe has sold nearly all of its available hunting and fishing permits,[6] the Tribe has allegedly suffered no revenue losses and no other "injury in fact" by the regulations the State would impose on non–member sportsmen.

The State's understanding of standing requirements is overly narrow. For purposes of standing, federal courts may certainly consider the principles of elementary economics. The State's imposition of higher costs on individual sportsmen clearly limits the Tribe's ability to raise the prices of its own licenses. *Cf. Agua Caliente Band of Mission Indians v. County of Riverside,* 442 F.2d 1184, 1186 (9th Cir. 1971). We have no reason to assume that the demand curve for reservation hunting and fishing is so inelastic that the Tribe could charge and receive any imaginable price for its licenses. Even though all tribal licenses are now sold, and applications for licenses exceed the number available, that fact merely reflects the Tribe's conservative adjustment to market forces in devising its own fee structure. Similarly, other conflicts between the tribal and state regulatory structures–e. g., variations in hunting seasons–necessarily deter some non–member hunters from entering the reservation at some times. These conflicts affect the Tribe's own regulatory scheme. They also influence the prices the Tribe may charge and impinge on the Tribe's revenue–raising powers. These effects are not merely speculative, but are the straightforward and immediate results of economic forces. *Cf. United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 683–90, 93 S.Ct. 2405, 2413–17, 37 L.Ed.2d 254 (1973).

Beyond economics, the Tribe has another legitimate basis for standing. When one sovereign entity is alleged to have usurped the authority lawfully belonging to another, the injured sovereign must have standing to challenge the usurpation. Other circuits have routinely found standing, without discussion, when Indian tribes have sought judgments that states were unlawfully interfering with tribal regulation of hunting and fishing. *See, e. g., Confederated Tribes of Colville Indian Reservation v. Washington,* 591 F.2d 89 (9th Cir. 1979); *Eastern*

---

**6.** In the first year that tribal antelope licenses were available, only six of ten were sold. The Tribe has sold all other available licenses, however, and we may safely assume that the antelope license figures reflect a temporary aberration.

*Band of Cherokee Indians v. North Carolina Wildlife Resources Commission*, 588 F.2d 75 (4th Cir. 1978).[7]

No other barrier to justiciability is present. The impact of the state regulation upon the Tribe is "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967). The limits of state jurisdiction on the reservation is an issue now as ripe for resolution as it will ever be. The State has made clear that prosecution of non–member violators of state game laws, with the attendant effects on tribal regulation and revenue–raising, is intended and probable. Record, vol. 1, at 204. *Cf. Poe v. Ullman*, 367 U.S. 497, 501–02, 81 S.Ct. 1752, 1754–55, 6 L.Ed.2d 989 (1961).

Finally, all indispensable parties are named in the suit. As the district court noted, "A determination that New Mexico game laws are not applicable to non–Indian activity within the Mescalero Apache Reservation cannot injuriously affect the interests of the United States . . . ." Record, vol. 1, at 204. In addition, "no act would be required of the Secretary [of the Interior] regardless of the outcome of the suit." *Id.* at 205.

## II. Federal Preemption

■ Any attempt by a state to exercise regulatory powers within the confines of a federally recognized, "semi–independent" Indian reservation is precluded if the subject matter has been preempted by federal law or if the state regulations infringe on the tribe's rights of self–government. *White Mountain Apache Tribe v. Bracker*, —— U.S. ——, ——, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980). Accordingly, in this jurisdictional dispute between a state government and an Indian tribe, we must first determine whether the applicable treaty and federal statutes, read against the "backdrop" of Indian sovereignty, preempt exercises of state power. *See McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973); *Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. 685, 690–91, 85 S.Ct. 1242, 1245–46, 14 L.Ed.2d 165 (1965). Under a standard of construction followed from the time of the Marshall Court, we must construe the applicable treaty and statutes liberally in order to further Indian interests. *See, e. g., Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *McClanahan v. Arizona State Tax Commission*, 411 U.S. at 174, 93 S.Ct. at 1263; *Squire v. Capoeman*, 351 U.S. 1, 6–7, 76 S.Ct. 611, 614–15, 100 L.Ed. 883 (1956); *Carpenter v. Shaw*, 280 U.S. 363, 366–67, 50 S.Ct. 121, 122–23, 74 L.Ed. 478 (1930); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832).[8]

■ The sovereign powers of the Tribe in wildlife management are so pervasive that sovereignty here moves from a mere backdrop into a leading role on the litigational stage. The historical relationship between Indian tribes, their lands, and the wild game thereon has of necessity been one of great interdependence. Access to and control of wildlife was "not much less necessary to the existence of the Indians than the atmosphere they breathed." *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905). After a careful, thoughtful analysis, the district court properly determined that, before the signing of the Treaty with the Apaches, July 1, 1852, 10 Stat. 979 (1852), the Tribe "had inherent and complete authority to control the fish and game found within the

---

7. Since standing is in part a constitutional concept, a federal court has an obligation to consider the issue even if the parties do not raise it. The lack of discussion in these cases therefore cannot reflect only party failure to press the standing issue.

8. The applicable treaty itself mandates "liberal construction . . . to the end that . . . the government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians." Treaty with the Apaches, July 1, 1852, art. 11, 10 Stat. 980 (1852).

confines of the tribal territory." Record, vol. 1, at 208. Since the treaty is "not a grant of rights to the Indians, but a grant of rights from them–a reservation of those not granted," *id.* (quoting *United States v. Winans*, 198 U.S. at 381, 25 S.Ct. at 664), the Tribe retains its authority even though the treaty itself did not fix the boundaries of the tribal reservation.[9] *Cf. Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). Abrogation of any rights protected by treaty, particularly fundamental hunting and fishing privileges, must be explicit to be effective, *see Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968), and no congressional enactment here meets that standard. *See United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).

■ The Tribe's inherent authority stems largely from the traditional reliance on wild game for basic survival needs. *See* F. Cohen, *Handbook of Federal Indian Law* 286 (1942). However, the Tribe's historical use of only some species within its territory does not mean that the game control powers reserved by treaty are less than all–encompassing. It is quite irrelevant whether the Mescalero at one time were primarily hunters, fishermen, or gatherers. At the treaty's signing, the United States must certainly have understood that the Tribe could alter its use of wildlife as conditions changed. For example, "[it is] inconceivable that the United States intended to withhold from the Indians the right to sustain themselves from any source of food which might be available on their reservation." *United States v. Finch*, 548 F.2d 822, 832 (9th Cir. 1976), *vacated on other grounds*, 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977).

The Tribe's sovereign powers are not, of course, limited to control of wildlife. The Tribe's historical powers extend to the territory itself. The State acknowledges that the Tribe has, at a minimum, the power of any landowner to exclude non–official persons from the reservation.[10] In the State's view, the Tribe may altogether forbid permission to hunt and fish or may condition the grant of permission upon compliance with state laws, but the Tribe may not exempt a non–member hunter from the application of state laws. The power of a landowner, however, provides only one source–and a secondary one–of tribal authority. *See Powers of Indian Tribes*, 55 Interior Dec. 14, 48–50 (1934). The Supreme Court has repeatedly stressed "that Indian tribes are unique aggregations possessing attributes of sovereignty over both their members *and their territory*; they are 'a separate people' possessing 'the power of regulating their internal *and social relations.*'" *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975) (emphasis added) (citations omitted) (quoting *United States v. Kagama*, 118 U.S. 375, 381–82, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228 (1886)). *See Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537, 541–43 (10th Cir. 1980); *United States v. New Mexico,* 590 F.2d 323, 327–28 (10th Cir. 1978) ("Indian nations [are] distinct political communities, having territorial boundaries in which their authority is exclusive"). In its most recent statement, the Court "emphasized that there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the preemption inquiry; . . . it remains an important factor to weigh in determining

9. The treaty mandated creation of a new tribal territory, but the actual boundaries of the reservation were set by a series of executive orders from 1873 until 1883.

10. In 1969 the Tribe informed the State that its game and fish officers would be welcome only if they obtained tribal permission to enter the reservation. The State has honored the Tribe's request, but it does not concede the Tribe's power to exclude officials. Brief for Appellants

at 9–10. Because of our resolution of the case, we do not reach the issue of the State's enforcement powers on the reservation. The Supreme Court also has not spoken on this question. *See Washington v. Confederated Tribes of Colville Indian Reservation*, —— U.S. ——, — —, 100 S.Ct. 2069, 2081–2083, 65 L.Ed.2d 10 (1980); *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 468 n.6, 96 S.Ct. 1634, 1639, 48 L.Ed.2d 96 (1976).

whether state authority has exceeded the permissible limits." *White Mountain Apache Tribe v. Bracker*, —— U.S. ——, ——, 100 S.Ct. 2578, 2587, 65 L.Ed.2d 665 (1980).

The State questions the existence of any inherent tribal powers in this case. It argues that the Tribe could not have exclusive rights in any traditional territory because, in effect, there is no traditional territory: "the Mescaleros were being swept from their lands by a tide of white settlers." Brief for Appellants at 37. If we were to accept the State's argument, we would be enshrining the rather perverse notion that traditional rights are not to be protected in precisely those instances when protection is essential, *i. e.*, when a dominant group has succeeded in temporarily frustrating exercise of those rights. We prefer a view more compatible with the theory of this nation's founding: rights do not cease to exist because a government fails to secure them. *See* The Declaration of Independence (1776).

In regulating game on the reservation, the Tribe thus seeks to exercise its sovereign power in an area in which it unquestionably has a "significant interest." *Cf. Washington v. Confederated Tribes of Colville Indian Reservation*, —— U.S. ——, ——, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). This case is therefore quite unlike *Colville*, in which the Court rejected tribal claims to an exemption from state taxation of reservation cigarette sales to non–members. Reservation sales outlets were, ex-cept in location, identical to their off–reservation competitors, and the product taxed was in no sense a tribal creation. Unlike the situation in this case, no significant *tribal* interest was involved.

This case is further unlike *Colville* in that here a definite conflict exists between the tribal regulatory structure and that of the State. In *Colville* the tribal and state taxing schemes were purely revenue–raising in nature, and dual systems of pure taxation are not inherently conflicting. In contrast, dual *regulatory* schemes, as the Court implied, necessarily create mutual dislocations. —— U.S. at ——, 100 S.Ct. at 2083.[11] It is because of this characteristic of regulation that we presume, when Indian tribes under federal protection seek to regulate their traditional interests, that federal law has preempted state jurisdiction. *See* D. Getches, D. Rosenfelt & C. Wilkinson, *Cases and Materials on Federal Indian Law* 295–99 (1979). "[T]hose standards of pre–emption that have emerged in other areas of the law" generally do not apply "to federal enactments regulating Indian tribes." *White Mountain Apache Tribe v. Bracker*, —— U.S. ——, ——, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980). As this court has recently emphasized, "[T]he cases stress that *regulatory* powers in Indian country or on Indian lands belong to the Congress except for inherent jurisdiction of the tribes. Congress may delegate this authority to the state, but when it does so it must be in specific terms." *United States v. New Mexico*, 590 F.2d 323, 328 (10th Cir. 1978) (emphasis added).[12]

11. In *Mescalero Apache Tribe v. O'Cheskey*, 625 F.2d 967 (10th Cir. 1980) (en banc), we were also not faced with dual regulatory schemes. The state tax there at issue, like the *Colville* tax, was purely revenue–raising in nature, and the Tribe had not imposed its own taxing scheme. In *United States v. Montana*, 604 F.2d 1162 (9th Cir. 1979), *cert. granted*, 445 U.S. 960, 100 S.Ct. 1645, 64 L.Ed.2d 234 (1980), the Ninth Circuit upheld dual regulation of hunting and fishing on the Crow reservation. The court assumed, however that tribal–state cooperation would be "forthcoming." 604 F.2d at 1172. Because of the Mescalero Apache Tribe's clear position in this case, we may make no such assumption. *See also Confederated Tribes of Colville Indian Reservation v.*

*Washington*, 591 F.2d 89, 91 (9th Cir. 1979) ("tribal government explicitly acknowledged that state jurisdiction would not constitute an obstacle to its efforts").

12. Insofar as other courts have improperly presumed the existence of state jurisdiction in similar cases, their decisions do not control our determination. *See, e. g., United States v. Montana*, 604 F.2d 1162, 1172 (9th Cir. 1979), *cert. granted*, 445 U.S. 960, 100 S.Ct. 1645, 64 L.Ed.2d 234 (1980). Nor does past participation by the State in reservation wildlife regulation necessarily limit any tribal claim of sovereign powers. *See* Brief for Appellant at 55. Past cooperation of the Tribe with the State reflects nothing more than a temporary waiver

As important as sovereignty is in this case, we need not consider whether the Tribe's sovereign powers alone are sufficient to preempt state jurisdiction. The Supreme Court has not ruled on that question but has noted, given the pervasiveness of federal treaties and statutes, that it is "something of a moot question." *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 172 n.8, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973). *See* Note, *Tribal Preemption*, 54 Wash.L.Rev. 633, 639 (1979). In this case, the treaty and statutory basis for federal preemption is strong. We see as sources of preemption (1) the treaty; (2) the Enabling Act for New Mexico; (3) the Indian Reorganization Act of 1934; (4) the tribal constitution and ordinances enacted pursuant to the IRA; (5) the extensive federal developmental assistance; and (6) the negative inferences from Public Law 280. These factors, considered in light of the Tribe's inherent powers over reservation land and wildlife, compel our conclusion of preemption.

The applicable treaty, as we have noted, implicitly reserves to the Tribe control over reservation hunting and fishing. In addition, the treaty is explicit in its expression of federal dominance on the reservation. In Article 1 of that document, the Tribe submits itself *"exclusively* [to] the laws, jurisdiction, and government of the United States of America." Treaty with the Apaches, July 1, 1852, 10 Stat. 979 (1852) (emphasis added).[13] Further, the treaty provides that the *United States* shall "designate, settle, and adjust [the Tribe's] territorial boundaries, and pass and execute . . . such laws as may be deemed conducive to the prosperity and happiness of

[the Mescalero Apaches]." *Id.,* art. 9, 10 Stat. 980.

The treaty's exclusivity language aids our interpretation of the Enabling Act for New Mexico, 36 Stat. 557 (1910), in which New Mexico Indian lands were placed "under the absolute jurisdiction and control of the Congress of the United States." Although *Organized Village of Kake v. Egan*, 369 U.S. 60, 68, 82 S.Ct. 562, 567, 7 L.Ed.2d 573 (1962), said that " 'absolute' federal jurisdiction is not invariably exclusive jurisdiction," *Egan* "did not purport to provide guidelines for the exercise of state authority in areas set aside by treaty for the exclusive use and control of Indians." *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 176 n.15, 93 S.Ct. 1257, 1264 n.15, 36 L.Ed.2d 129 (1973). In the area of resource management, the treaty language in this case suggests that "absolute" jurisdiction is indeed "exclusive" jurisdiction.[14]

The tribal constitution gives to the Mescalero Apache Tribal Council the power "[t]o protect and preserve the property, wildlife and natural resources of the tribe, and to regulate the conduct of trade and the use and disposition of tribal property upon the reservation." Mescalero Apache Tribe Revised Const. art. 11, § 1(c).[15] That constitution was adopted and approved pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 476, under which Congress provided that the adoption of a tribal constitution reconfirms in the tribe "all powers vested . . . by existing law." The statute thus reconfirms all preexisting powers of the Tribe and itself becomes a source of preempting power. *See White Mountain Apache Tribe v. Bracker*, —— U.S. ——,

---

of the Tribe's preemptive rights in the hunting and fishing area.

**13.** *New Mexico does not challenge the validity of the treaty.* The parties stipulated that it was signed by a representative of the Tribe. Record, vol. 1, at 118.

**14.** The New Mexico Supreme Court has understood the implications of the *McClanahan* clarification of *Egan*. In a case involving the Mescalero Apaches, the court viewed the clarification as a refusal "to extend the concept of

concurrent federal and state jurisdiction to cases which arise in areas set aside by treaty for the exclusive use and control of Indians." *Chino v. Chino*, 90 N.M. 203, 205, 561 P.2d 476, 478 (1977).

**15.** The constitution also provides that "[n]o provision . . . shall be construed as a limitation on the inherent residual sovereign powers of the Mescalero Apache Tribe." Mescalero Apache Tribe Revised Const. art. 27, § 1.

——, ——, 100 S.Ct. 2578, 2583, 2584 n.10, 65 L.Ed.2d 665 (1980); Note, *Balancing the Interests in Taxation of Non–Indian Activities on Indian Lands,* 64 Iowa L.Rev. 1459, 1463, 1463 n.27 (1979).

■ Tribal power over reservation hunting and fishing was unquestionably vested prior to 1934. Tribal ordinances enacted to implement traditionally held, and congressionally approved, powers, may themselves serve to preempt the State. The Supreme Court saw another similarly enacted tribal ordinance as the implementation of "an overriding federal policy which is clearly adequate to defeat state jurisdiction." *Fisher v. District Court,* 424 U.S. 382, 390, 96 S.Ct. 943, 948, 47 L.Ed.2d 106 (1976). Any constitutional limitations on congressional authority to delegate its legislative powers are "less stringent . . . where [as here] the entity exercising the delegated authority itself possesses independent authority over the subject matter." *United States v. Mazurie,* 419 U.S. 544, 556–57, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975). The tribal scheme also negates any argument that the Tribe has not manifested an intent to preempt state jurisdiction. *Cf. Confederated Tribes of Colville Indian Reservation v. Washington,* 591 F.2d 89 (9th Cir. 1979).

The Fourth Circuit has held that extensive federal participation in reservation wildlife development is itself an element indicating federal preemption. *Eastern Band of Cherokee Indians v. North Carolina Wildlife Resources Commission,* 588 F.2d 75, 78 (4th Cir. 1978). In *Eastern Band,* as here, the federal government and the Tribe had developed the reservation fishing program with no state assistance. Where the State plays no role in stocking reservation waters, it "has no perceivable interest in reservation fishing." *Id.*[16] *See White*

---

16. In *Eastern Band,* Chief Judge Haynsworth emphasized that the fishing program was a "purely commercial undertaking" of the Cherokees. 588 F.2d at 79. We believe that the tribal interests are, if anything, enhanced when the purposes of the wildlife regulation are much broader.

*Mountain Apache Tribe v. Bracker,* —— U.S. ——, ——, 100 S.Ct. 2578, 2587, 65 L.Ed.2d 665 (1980). *See also Central Machinery Co. v. Arizona State Tax Commission,* —— U.S. ——, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980).

Finally, we infer federal preemption from the statutory structure of Public Law 280, 67 Stat. 590 (1953), and its later amendments. Under that statute, New Mexico had the option until 1968 of unilaterally asserting civil and criminal jurisdiction over the Mescalero Apache reservation. It did not do so. *See McClanahan v. Arizona State Tax Commission,* 411 U.S. at 177–79, 93 S.Ct. at 1265–66. Even had the State assumed jurisdiction, the statute in its present form specifically protects the tribes from the deprivation of "any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulating thereof." 25 U.S.C. § 1321(b). If those states which accepted Public Law 280 jurisdiction may not hinder traditional hunting and fishing rights, New Mexico *a fortiori* may not do so.

The presumption of federal preemption is clearly not overcome by a treaty and statutory scheme which reassert the exclusivity of federal and tribal regulation of hunting and fishing. The State may not apply its game laws to persons for acts done on the reservation.[17]

### III. Tribal Self–Government

■ The second test for determining the propriety of state regulation on Indian reservations analyzes the impact of the regulation on tribal self–government. Even if the treaty and statutory scheme, read against the backdrop of sovereignty, were insufficient to create federal preemption, the

---

17. Our analysis does not attach independent preemptive significance to 18 U.S.C. § 1165. *Cf. Central Machinery Co. v. Arizona State Tax Commission,* —— U.S. ——, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980). The import of that statute is addressed in Part V.

Tribe's authority is here protected under a tribal self–government analysis.[18]

In the landmark case of *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), which upheld tribal court jurisdiction over non–Indians, the Supreme Court restated the controlling test: "Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Id.* at 220, 79 S.Ct. at 271. To apply that test, a court must "[seek] an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." *Washington v. Confederated Tribes of the Colville Indian Reservation,* —— U.S. ——, ——, 100 S.Ct. 2069, 2083, 65 L.Ed.2d 10 (1980). Congress has identified one overriding federal interest by "recogniz[ing] the obligation of the United States to respond to the strong expression of the Indian people for self–determination." 25 U.S.C. § 450a(a).

In the context of its analysis of the pure-taxation schemes of the tribe and state in *Colville*, the Supreme Court delineated the relevant considerations for the balancing process:

> While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off–reservation value and when the taxpayer is the recipient of state services.

—— U.S. at ——, 100 S.Ct. at 2083. In the case before is, the scales tip decisively in the Tribe's favor.

Unlike *Colville*, we here have a clear state interference with a traditional tribal regulatory power. To restrict the application of the tribal scheme to members only would be to complicate excessively the enforcement process and to render the very idea of "regulation" an absurdity. Here the Tribe has, with the aid of the federal government, generated the "value . . . on the reservation" which it now seeks to control and whose benefits it seeks to enjoy. The state services received by on–reservation sportsmen are minimal–incidental spillover effects of state activities outside the reservation. In fact, the spillover benefits to the *State* from the tribal conservation scheme–e. g., development of the migratory elk herd–may well be more significant. Although New Mexico has a legitimate interest in the conservation of its wildlife, the Tribe's activities do not threaten that interest in any way.

The Ninth Circuit held, in *United States v. Sanford*, 547 F.2d 1085 (9th Cir. 1976), that Montana's elk hunting laws were applicable to non–Indians hunting on a tribal reservation. The court found no indication that Montana game laws interfered with tribal self–government. *Id.* at 1089. In distinguishing *Sanford*, the Fourth Circuit emphasized that "there was no showing in *Sanford* that the applicability of Montana's game laws . . . would materially affect or frustrate the Indians' governance of themselves or any commercial, conservationist or other program administered by the Indians for their own advantage." *Eastern Band of Cherokee Indians v. North Carolina Wildlife Resources Commission*, 558 F.2d 75, 78–79 (4th Cir. 1978). In this case, precisely that sort of showing was made.

*Washington v. Confederated Tribes of the Colville Indian Reservation,* —— U.S. ——, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980),

---

18. We recognize that the preemption and self–government analyses overlap, and that the Supreme Court appears to be gradually collapsing the tests into one. *See Washington v. Confederated Tribes of Colville Indian Reservation,* —-- U.S. ——, ——-- ——, 100 S.Ct. 2069, 2082–83, 65 L.Ed.2d 10 (1980). Nonetheless, the two tests continue to provide different analytical perspectives. *See White Mountain Apache Tribe v. Bracker,* —— U.S. ——, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980).

734

indicates that state regulation of an activity in which a tribe has no significant interest–and where the only effect on the tribe is to limit tribal revenues–does not infringe upon tribal self–government. *Id.* at —— ——, 100 S.Ct. at 2082–83. However, such an effect still remains a factor to be considered, for "financial self–sufficiency" is "one major goal of tribal self–government." *Eastern Band of Cherokee Indians v. North Carolina Wildlife Resources Commission*, 588 F.2d at 78. *See also White Mountain Apache Tribe v. Bracker*, —— U.S. ——, ——, 100 S.Ct. 2578, 2586, 65 L.Ed.2d 665 (1980). The unquestioned importance to the Tribe of the game revenues contributed to the district court's determination that tribal self–government was infringed upon, and we affirm that finding.

Finally, we note that underlying the infringement test is a desire to promote the development of indigenous Indian institutions. Congress has declared that its policy is "to help develop and utilize Indian resources . . . to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources." 25 U.S.C. § 1451. If we were to permit state interference with the tribal scheme, we would be effectively "deny[ing] Indians the opportunity of developing their own system." *Chino v. Chino*, 90 N.M. 203, 561 P.2d 476, 479 (1977). The federally declared policy of self–determination becomes a mockery if it is subject to defeasance by the State.

#### IV. Environmental Concerns

■ This nation has recently begun to recognize the fragility of the natural environment. However, the federal system, whose competing sovereignties serve to protect individual liberties, may not provide the optimum environmental regulatory scheme. The State suggests that, whatever the justification for exclusive tribal regulation under a traditional legal analysis, the seriousness of ecological problems creates an implied exception in this case. The State proclaims that "its management efforts are directed to biological rather than political units," Brief for Appellant at 27, so state regulation should be allowed.

The State vastly overstates its case. Just as wildlife does not respect reservation boundaries, it also does not respect the boundaries of states. The State surely does not mean to suggest that it ignores *state* boundaries in its enforcement efforts. Somewhat inconsistently, the State also maintains that, "[s]ince wildlife exists in widely varying conditions throughout the United States," "there is no dominant federal interest which requires preemption." Brief for Appellant at 55. The State's "biological units" argument would seem logically to *prefer* federal regulation, because only that regulation can take account of the varying conditions without the restraints of political boundaries. Hence, if ecological necessities were to require changes in constitutional arrangements–a position we certainly do not endorse–the changes would not necessarily be those suggested by the State.

In its ecological analysis, the State misinterprets Supreme Court language declaring the common law duty of a "state in its sovereign capacity" to protect wildlife "for the common benefit of all of its people." *LaCoste v. Department of Conservation*, 263 U.S. 545, 549, 44 S.Ct. 186, 187, 68 L.Ed. 437 (1924). That language does not describe the ecologically optimum vehicle for regulation of wildlife. Nor does it require that only one sovereign, the State, participate in wildlife management. Instead, it is descriptive of the trusteeship duty imposed on *all* sovereigns. The Tribe as a sovereign has undertaken that duty, as the State concedes, in an exemplary fashion, vastly improving the wildlife habitat on the reservation. Therefore, the Ninth Circuit's reasoning in *United States v. Montana*, 604 F.2d 1162 (9th Cir. 1979), *cert. granted*, 445 U.S. 960, 100 S.Ct. 1645, 64 L.Ed.2d 234 (1980)–that simultaneous state regulation is permissible if the state purpose is "conservation and proper management of game and fish," 604 F.2d at 1166–simply does not extend to this case. Based on the Tribe's record in wildlife management, we, unlike the Ninth Circuit, are *not* "convinced that

the preservation and improvement of the stocks of fish and game," *id.* at 1170, requires dual regulation.

## V. Enforcement

■ Our analysis has indicated that the Tribe has plenary power over reservation wildlife management. In this section we consider whether the absence of tribal criminal jurisdiction over non–members necessitates a cutback in that power.

New Mexico relies heavily on an enforcement vacuum that would allegedly exist if the State could not assert its criminal jurisdiction over the Indian reservation. The State insists that "[c]riminal jurisdiction over non–Indian hunters and fisherman [*sic*] is indispensable to effective management." Brief for Appellant at 36. *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), effectively repudiated tribal criminal jurisdiction over non–members, and 18 U.S.C. § 1165,[19] it is argued, gives the United States jurisdiction over trespass only. Hence, the State maintains that without state criminal sanctions, violations by non–members would go unpunished and enforcement would be impossible. We believe New Mexico has overstated the effect of *Oliphant* and the need for *criminal* jurisdiction, and has underestimated the potential reach of § 1165.

New Mexico's interpretation of *Oliphant* would lead to the untenable conclusion that the Supreme Court implicitly abolished most aspects of tribal sovereignty, while at the same time asserting the continuing validity of that doctrine.[20] Many tribal powers that derive from inherent sovereignty would perhaps best be enforced through criminal sanctions. However, the *Oliphant* Court clearly did not intend to end all traditional tribal authority, including, for example, the taxing power–a power this court has recently reaffirmed. *See Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537 (10th Cir. 1980) (en banc). In fact, the Supreme Court has recognized the limited nature of the *Oliphant* holding. *See Washington v. Confederated Tribes of the Colville Indian Reservation,* —— U.S. ——, ——, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980).

Many regulatory schemes, at all levels of government, exist without criminal sanctions for enforcement purposes. New Mexico itself relies in part on civil sanctions in its hunting and fishing enforcement scheme. *See, e. g.,* N.M.Stat.Ann. § 17–2– 26 (1978). Although the Tribe may not assert criminal jurisdiction over non–members, the Supreme Court has at no time denied the power of an Indian tribe to assert its civil powers. For example, "[t]ribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non–Indians." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65, 98 S.Ct. 1670, 1681, 56 L.Ed.2d 106 (1978). *See also Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). There is no inconsistency in the existence of tribal regulatory power without the availability of criminal sanctions. *Cf. United States v. Montana*, 604 F.2d 1162, 1165 (9th Cir. 1979), *cert. grant-*

---

**19.** Section 1165, entitled "Hunting, trapping, or fishing on Indian land," reads:

Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

**20.** Recent Supreme Court reiterations of the continuing importance of tribal sovereignty are legion. *See, e. g., Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55–56, 98 S.Ct. 1670, 1675–76, 56 L.Ed.2d 106 (1978); *United States v. Wheeler*, 435 U.S. 313, 322–28, 98 S.Ct. 1079, 1085–89, 55 L.Ed.2d 303 (1978); *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978); *United States v. Antelope*, 430 U.S. 641, 646, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977); *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975).

*ed,* 445 U.S. 960, 100 S.Ct. 1645, 64 L.Ed.2d 234 (1980). Included in the Tribe's unquestioned authority is the power to expel those who violate tribal ordinances on the reservation. *See Quechan Tribe of Indians v. Rowe,* 531 F.2d 408, 411 (9th Cir. 1976).

We reject the State's assertion that we must imply a divestiture of tribal sovereignty in any area in which the Tribe becomes involved with non–members. The Supreme Court has noted that "[t]he areas in which . . . implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe," *United States v. Wheeler,* 435 U.S. 313, 326, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303 (1978), but the Court did not mean that sovereignty has necessarily been divested whenever a tribe's external relations are involved. The divestiture found in *Oliphant* is of a very special sort, and "[i]n most respects the *Oliphant* Court's rationale does not apply to noncriminal cases." Collins, *Implied Limitations on the Jurisdiction of Indian Tribes,* 54 Wash.L.Rev. 479, 508 (1979). *See* Note, *Balancing the Interests in Taxation of Non–Indian Activities on Indian Lands,* 64 Iowa L.Rev. 1459, 1467–69 (1979).

Even if tribal civil sanctions are not sufficient to provide efficient wildlife regulation, the criminal authority of the United States under 18 U.S.C. § 1165 could be interpreted broadly enough to fill much of any enforcement vacuum. When a non-member violates, for example, a tribal bag limit, he can be considered to have gone upon tribal land "without lawful authority or permission." His permission to enter was conditioned upon his observance of tribal game regulations.[21] The scienter element of the statute does not require for conviction that the offender intended to violate tribal lawful authority when he entered the land. The requirement is only that he "knowingly goes upon any land . . . for the purpose of hunting, trapping, or fishing thereon." If the statute does leave an enforcement vacuum, it would be for that very limited class which enters the reservation with no intent to participate in hunting, trapping or fishing and then violates the tribal game ordinances.

## VI. Effect of Injunction

We must address one final question, an alleged lack of clarity in the district court's order. That ambiguity reflects, it is argued, the application of improper standards in granting injunctive relief. The State suggests that the district court's injunction provides incomplete relief to the Tribe because it expressly governs only "acts done on the Reservation" and does not address the State's claimed power to regulate *possession* of game off the reservation. Brief for Appellant at 23–24.

No dilemma exists. The simple answer is that, absent justification, the State may not discriminatorily prohibit possession of game lawfully obtained from the reservation while permitting possession of game obtained elsewhere. *See* N.M.Stat.Ann. § 17–2–7 A(2) (1978). A proper game license from another state is presumably a defense to a New Mexico prosecution for possession of game without a New Mexico license. The same principle applies to game obtained on the reservation with a proper tribal license. Unless New Mexico is willing to prohibit possession of game altogether, it may not prohibit possession of game legally obtained from a source outside the State's jurisdiction. The Supreme Court has recently stressed that a state's historic interest in protection of wild animals, *see Geer v. Connecticut,* 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896), does not extend to

---

**21.** This interpretation of § 1165 may differ in spirit from that of the Ninth Circuit: "[S]ection 1165 must be considered to be a statute providing a penalty for trespass to an Indian reservation and not an attempt by Congress to enter the field of fish and game regulation." *United States v. Sanford,* 547 F.2d 1085, 1089 (9th Cir. 1976) (quoting *State v. Danielson,* 149 Mont. 438, 427 P.2d 689, 691 (1967)). However, we do not believe that it differs in substantive result. It is sufficient for purposes of providing an enforcement mechanism that § 1165 be read merely as an anti–trespass statute.

the "*ownership* of game that had been lawfully reduced to possession." Hughes v. Oklahoma, 441 U.S. 322, 327, 99 S.Ct. 1727, 1732, 60 L.Ed.2d 250 (1979).

The district court's injunctive order properly protected its declaratory judgment.

AFFIRMED.

BREITENSTEIN, Circuit Judge, concurring in the result.

I concur in the result. In my opinion New Mexico may not enforce its fishing and hunting laws on the Mescalero Apache Reservation. The Tribe has the right of self–government. See *Joe v. Marcum*, 10 Cir., 621 F.2d 358 (1980). The control which the Tribe has exercised over fishing and hunting is reasonable. The Supreme Court has long been solicitous in its protection of the fishing and hunting rights of Indians. *Cheyenne–Arapaho Tribes v. State of Oklahoma*, 10 Cir., 618 F.2d 665, 669. Dual Tribe and State control may be appropriate as an aid in the conservation of fish and game. Id. at 667. The instant record shows no need for joint conservation measures. The right of the State to regulate off–reservation possession of game lawfully reduced to possession in accordance with Tribal law is foreclosed by *Hughes v. Oklahoma*, 441 U.S. 322, 327, 335–336, 99 S.Ct. 1727, 1731, 1736–37, 60 L.Ed.2d 250.